UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
SEAMUS MCDERMOTT

                    Plaintiff,

          -against-

CAROLYN W. COLVIN
Acting Commissioner, Social Security
Administration,

                    Defendant.
-----------------------------------------------------------X
FEUERSTEIN, J.

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E D N Y

★     SEP 3 0 2015     ★

LONG ISLAND OFFICE

**ORDER**
14-CV-2747 (SJF)

Seamus McDermott ("plaintiff" or "claimant") previously worked as an engineer's assistant in commercial high-rise buildings, and performed maintenance work on mechanical systems, electric systems, and plumbing. He developed a seizure condition, applied for disability benefits, and was denied. He commenced this 42 U.S.C. § 405(g) action, *pro se*, seeking judicial review of the final determination of defendant Commissioner of Social Security Administration ("Commissioner") denying plaintiff's application for disability benefits. The Commissioner now moves for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons that follow, the Commissioner's motion is granted.

## I.      BACKGROUND

### A.      Administrative Proceedings

Plaintiff applied for disability insurance benefits and Supplemental Security Income (SSI) on February 23, 2011, alleging a disability beginning on December 1, 2008 (onset date). [Docket Entry No. 19 (Transcript of Administrative Record (Tr.)) 131]. The application was denied on April 25, 2011. Tr. 70–74. Plaintiff requested a hearing and appeared with counsel before administrative law judge (ALJ) Gal Lahat on May 2, 2012. *Id.* at 55, 38–68. On June 15,

2012, the ALJ determined that plaintiff was not disabled. *Id.* at 19–37. On August 19, 2013, the Appeals Council denied his request for review. *Id.* at 6–9. Plaintiff commenced this appeal, and on November 25, 2014, the Commissioner moved for judgment on the pleadings [Docket Entry No. 17].

B. Medical Evidence

Plaintiff, born July 13, 1968, suffered a seizure at age thirty-two (32) which rendered him unconscious. Tr. 328. On October 2, 2008, at the age of forty (40), he had another seizure while he was working on a tower, and fell to the ground. *Id.* at 328, 265. Dr. Laura Schoenberg, M.D., a neurologist, referred him for magnetic resonance imaging (MRI) and computerized tomography (CT) scan on October 10, 2008 and. *Id.* at 328, 649, 650, 210. The scans revealed "no abnormalities in signal or architecture in the parenchymal temporal lobes," but "a prominent flow void . . . in the right temporal region in the distribution of the right middle cerebral artery." *Id.* at 649. Dr. Gene Y Berkovich, MD, at Nassau Radiological Group, PC (NRAD) recommended angiography, which occurred on November 10, 2008 at NRAD. *Id.* at 649–50. Magnetic resonance angiography (MRA) of his brain revealed an aneurysm on the right middle cerebral artery, measuring six millimeters by six millimeters (6 mm x 6 mm) and a segment bifurcation aneurysm on the left middle cerebral artery (MCA) and measuring one millimeter by two millimeters (1 mm x 2 mm). *Id.* at 650.

On December 22, 2008, plaintiff was admitted to North Shore University Hospital where he underwent a right craniotomy and clipping of the right MCA aneurysm. *Id.* at 328. A post-craniotomy angiogram revealed that the operation removed the aneurysm. *Id.* A CT scan revealed right frontal subdural and interhemispheric gas, a "mild underlying mass effect with

2

slight mass effect on the right frontal horn," "effacement of the right MCA cistern," "no significant midline shift," and no evidence of "acute infarct." *Id.* at 426. Plaintiff developed fever, and was discharged to his home on December 30, 2008. *Id.* at 328.

On April 8, 2010, plaintiff walked into an elevator, had a seizure, and woke up as an ambulance crew was taking him to the emergency room at St. Luke's Roosevelt Hospital. *Id.* at 209, 211. He was still tremulous when he was admitted. *Id.* at 211. He was able to walk with assistance, and speak in complete sentences, denied any pain, denied drug use, but stated that he drank alcohol occasionally and smoked. *Id.* at 210. A CT scan of his head, which was compared with the October 10, 2008 CT scan, showed no evidence of intracranial hemorrhage, extra-axial fluid collection, no midline shift, mass effect, or acute cortical infarct, and he was discharged the same day. *Id.* at 210–11.

On May 17, 2010, plaintiff had another seizure, this time at work, and was able to get to St. Luke's Roosevelt Hospital on his own. *Id.* at 213, 215. Although he bit his tongue, he reported no pain, and was alert and oriented. *Id.* at 215. Plaintiff was taking Lamictal, an anti-seizure medication. *Id.* at 213, 216. A CT scan was performed and was correlated with the April 8, 2010 CT scan. *Id.* It revealed a pterional craniotomy defect, but no evidence of intracranial mass effect, hemorrhage, extra-axial fluid collection, no midline shift, mass effect, or large vessel territorial infarction. *Id.* at 214. Overall, there was no "interval change in the appearance of the intracranial contents" from the April 8, 2010 CT scan. *Id.* The physician prescribed Ativan, recommended that he continue seizure medications, and discharged him the same day, indicating that he could work without restrictions. *Id.* at 214, 216.

On July 19, 2010, plaintiff saw Dr. David Steiner, M.D., at Five Towns Neurology, P.C. for his seizure condition. *Id.* at 226. Dr. Steiner indicated that plaintiff was an alcoholic, and that at the time of his two most recent seizures, he had been "drinking heavily." *Id.* at 226. Since then, he had been to rehab for his alcoholism, was taking his Lamictal regularly. *Id.* He had not been drinking, and had not suffered any recent seizures. *Id.* He stated that he would like to return to work plumbing holes but needs clearance. *Id.*

Dr. Steiner wrote that plaintiff did not suffer from fever, malaise, or night sweats, can function independently, take care of his own needs, and did not suffer from depression, bipolar, or psychosis. *Id.* at 227. He was alert and oriented, conversational, and exhibited normal judgment. *Id.* Dr. Steiner performed an electroencephalogram (EEG), found evidence of right-sided temporal spikes, and diagnosed convulsive epilepsy and complex partial epilepsy. *Id.* at 228, 230. He saw "no problem" with plaintiff working, but cautioned against "the use of heavy machinery with ongoing seizure precautions," cautioned against drinking, and ordered a follow-up visit in four to six weeks. *Id.*[1]

Dr. Steiner examined plaintiff on August 17, 2010, and performed an EEG diagnostic test. *Id.* at 231, 253. Plaintiff was still taking Lamictal, was still abstaining from drinking, and had not experienced any seizures. *Id.* The EEG test was "abnormal," and revealed right-sided spikes "that appear to represent technical artifact," which raised concerns that plaintiff had epilepsy. *Id.* Dr. Steiner recommended that plaintiff undergo a 48-hour EEG, and changed his diagnoses of convulsive and partial epilepsy to "rule out" diagnoses. *Id.* at 230–32, 253. He

---

[1] Plaintiff also received a letter dated July 19, 2010 from his employer, a property management company, requiring medical clearance for plaintiff to return to work due to the number of seizures he had suffered at work. Tr. 262.

again recommended that plaintiff not drink, allowed plaintiff to work, and cautioned against operating heavy machinery and driving. *Id.* at 231. Plaintiff stopped working on October 15, 2010. *Id.* at 265.

On October 25, 2010, plaintiff was taken to Saint Luke's Roosevelt Hospital by ambulance after another seizure. *Id.* at 218–19. Although the ambulance crew found him in a postictal state, by the time he arrived at the hospital, he was alert and oriented, he had no tremors, his breathing was regular and unlabored, and he walked steadily with a normal gait. *Id.* at 220. He was discharged the same day, and was advised to continue taking Lamictal as prescribed. *Id.* at 219–20.

Dr. Steiner examined plaintiff on October 26, 2010, diagnosed him with convulsive and partial complex epilepsy, and recommended that he double his dosage of Lamictal. *Id.* at 232–34. Plaintiff also reported episodes of shaking, his deep tendon reflexes were two (2) out of four (4), his walking was normal, and his motor abilities were intact. *Id.* at 220. Dr. Steiner again permitted plaintiff to return to work, again cautioning against drinking, and operating heavy machinery, and driving. *Id.* Plaintiff saw Dr. Steiner again on November 12, 2010, and reported that he felt "good." *Id.* at 237. The results of physical examination were the same as the October 26, 2010 visit, Dr. Steiner again opined that plaintiff could work, so long as he did not operate heavy machinery, drive, or drink, and took basis seizure precautions. *Id.* at 238.

On December 29, 2010, plaintiff returned to Dr. Steiner complaining of hot and cold spells, headaches, pruritic rashes, which he attributed to his increased intake of Lamictal, and shaking at night. *Id.* at 240. The results of his physical examination were unchanged, except for erythematous lesions on his chest and arms. *Id.* at 240–41. His diagnosis was convulsive

5

epilepsy with a rule-pout diagnosis of complex partial epilepsy. *Id.* at 241. Dr. Steiner recommended that plaintiff discontinue his Lamictal prescription, and begin another regimen of anti-convulsive medications, undergo a forty-eight (48)-hour EEG, avoid driving and heavy machinery, take "extreme seizure precaution," and abstain from alcohol, but did not state whether plaintiff could return to work. *Id.*

Plaintiff returned to Dr. Steiner on January 25, 2011, regarding a seizure that had occurred two weeks prior. *Id.* at 243. He told Dr. Steiner that he had been treated at Long Island Jewish Hospital, that he had been prescribed Keppra there, and that he had not experienced any seizures since. *Id.* at 243. The results of his physical examination had not changed since his December 29, 2010 visit, and he was prescribed Xanax. *Id.* at 243–44. On February 23, 2011, plaintiff returned for a follow-up visit, and reported no seizures, but reported severe headaches, and tremors since he was prescribed Keppra. *Id.* at 245–46. Plaintiff returned to Dr. Steiner on March 10, 2011, and again complained of severe headaches and tremors, but no seizures. *Id.* at 249. Physical examination results were unchanged, though his Keppra dosage was increased. *Id.* at 249–53.

On April 12, 2011, Dr. Rajpaul Singh, a board-certified neurologist at Hillside Neurology Care (Hillside), examined plaintiff. *Id.* at 266, 322. He reported that plaintiff had not worked since October 15, 2010, that plaintiff was a recovering alcoholic who was in Alcoholics Anonymous, and that plaintiff denied drinking alcohol recently. *Id.* at 265. He noted that plaintiff had a mild tremor in his hands, for which he took Xanax. *Id.* Plaintiff stated that the tremor became worse "when he reaches for objects, writes, buttons or zips his clothing," but did not occur at rest. *Id.* Plaintiff's did not experience tremors in his voice, head, tongue, or legs,

6

and he did not have any stiffness in the limbs or difficulties moving. *Id.* Except for plaintiff's hand tremors, and bilateral dysmetria, he was neurologically intact. *Id.* at 266–67.

Dr. Singh diagnosed epilepsy, stable post-cerebral aneurysm clipping status, tremors, not otherwise specified, and stable alcohol dependence syndrome. *Id.* at 267. He increased plaintiff's Keppra prescription, recommended a low-fat, high-fiber diet with fruits and vegetables, and restricted plaintiff from driving, hazardous machinery, unprotected heights, and unsupervised swimming. *Id.*

On April 21, 2011, Dr. A. Auerbach examined plaintiff on behalf of the New York State Office of Temporary and Disability Assistance, and determined that his neurologic exam was "stable and within normal limits." *Id.* at 254. He admitted that he did not "have much information," but opined that plaintiff's seizures were alcohol-related, and recommended that plaintiff observe seizure precautions. *Id.*

On April 26, 2011, plaintiff was taken to the emergency room at Danbury Hospital in following a seizure that lasted three (3) minutes. *Id.* at 276. He experienced tonic–clonic movements, loss-of-consciousness, and a headache and somnolence after he awoke from a postictal state. *Id.* He had consumed four (4) four beers two (2) to four (4) shots of vodka, and smoked marijuana the night before. *Id.* at 277. His vital signs were stable, and he reported no pain. *Id.* The treating physician wrote that plaintiff's drug use and alcohol consumption likely precipitated the seizure, and discharged him the same day. *Id.* at 279–84.

Plaintiff saw Dr. Singh on May 18, 2011, and reported that he was still taking Keppra without side-effects. *Id.* at 311. He reported anxiety, mild depression and hand tremors of mild to moderate severity, but was otherwise stable. *Id.* Dr. Singh wrote that plaintiff was "not in the

7

process of recovery" for his alcoholism. *Id.* at 312. Except for an anxious affect, and hand tremors, his neurological signs were normal. *Id.* at 313. Dr. Singh performed an EEG, and diagnosed epilepsy with recurrent seizures, tremors, anxiety, post-cerebral aneurysm clipping status, and alcohol dependence syndrome. *Id.* at 313–14.

On May 27, 2011, and August 27, 2011, plaintiff returned to Dr. Singh for routine EEG testing and physical examination, and reported no seizures. *Id.* at 268–70, 315–16. EEG tests revealed no abnormalities. *Id.* at 319. Plaintiff continued to experience mild to moderate hand tremors, but his physical examination results and diagnosis had not changed since his May 18, 2011 visit. *Id.* at 318–22.

On April 10, 2012, Dr. Singh completed a functional assessment form, on which he indicated plaintiff's diagnosis of epilepsy and post-aneurysm clipping status, and that plaintiff was not "medically able to work with or without limitations," and "totally disabled due to seizures," but then listed plaintiff's limitations, stating that he had no limitations on lifting, carrying, or pushing up to ten pounds (10 lbs), walking, standing, bending, sitting, or using public transportation. *Id.* at 647. Plaintiff had limitations on his ability to climb, and was recommended to avoid high and low temperatures, sudden temperature changes, high places, noise, skin irritants, dust, and odors and fumes. *Id.* at 647–48.

C.    Testimony

Plaintiff worked for twenty-two (22) years as a tradesman's assistant, and for the two (2) years preceding the hearing, he worked as an operating engineer's helper in commercial high rises. Tr. 44–45, 56. Prior to that, he worked as a plumber's assistant. *Id.* at 56. The operating engineer's helper job entailed maintaining mechanical machines, house calls, plumbing, heating,

and electrical work. *Id.* at 45. It required lifting objects weighing up to one hundred pounds (100 lbs), standing and walking for up to seven (7) hours a day, crawling, climbing, and bending. *Id.* Specifically, plaintiff was required to climb pipes and ladders, which was a common occurrence in his daily work. *Id.* at 46. He has not worked since October 2010, when he quit after experiencing seven (7) seizures.. *Id.* at 46–47. Plaintiff cannot predict the onset of his seizures, and testified that they "can happen any time." *Id.* His most recent seizure occurred in April 2011. *Id.* at 55.

Plaintiff took Keppra, an anti-seizure medication, which caused drowsiness as a side-effect. *Id.* at 51. His neurologist restricted him from climbing ladders and scaffolding, and, as a consequence, he cannot perform his former job duties as an engineer's helper. *Id.* Plaintiff has memory and concentration difficulties. *Id.* at 54.

Plaintiff admitted to prior alcohol abuse, but denied that he drank presently, and stated that he was in Alcoholics Anonymous. *Id.* at 52, 60. He attended a rehabilitation and detoxification program. *Id.* at 58. He lost his driver's license in 2007, and now uses public transit without difficulty. *Id.* at 57. He lives alone, but visits his brother and girlfriend daily. *Id.* at 53. He does his own grocery shopping, housecleaning, and laundry, and is not restricted in any of his daily activities. *Id.* at 57–58. He used to play football, hockey, and baseball, but has not done these activities since 2005. *Id.* at 58.

Ruth Vrook, a neutral vocational expert, testified that, plaintiff's former work as an engineer's helper corresponded to Dictionary of Occupational Titles (DOT) 899.684-022, heavy, unskilled work, and his work as a plumber's assistant corresponded to DOT 869.664-014, which was heavy, semi-skilled work. *Id.* at 62. She testified that an individual who is unable to climb

9

scaffolds, ladders, who is unable to work around moving mechanical parts, and who is unable to drive, would not be able to work either job. *Id.* at 63–64. However, a hypothetical person with these limitations would be able to work as a bench assembler, DOT 706.684-022, which is light unskilled work, and of which there are 2,660 jobs in the census area encompassing New York, White Plains, and Wayne, New Jersey. *Id.* at 61–63. He could also worked as a table worker, DOT 739.687-182, which is a sedentary, unskilled job, with 7,160 jobs in the same census area and 410,750 nationally. *Id.* at 63. Alternatively, he could work as a parking lot cashier, DOT 211.462.010, a light, unskilled job, of which there are 97,560 nationally, and 3,354,000 jobs locally. *Id.*

D. ALJ Decision

The ALJ employed the five (5)-step sequential analysis set forth in 20 C.F.R. § 404.1520, found that plaintiff was "not disabled" within the meaning of the Social Security Act, and denied his disability benefits. Tr. 24–34. He found that plaintiff met the insured status requirements through December 31, 2015, that he engaged in substantial gainful activity through October 1010, but that he has not engaged in substantial gainful activity for a continuous twelve (12)-month period. *Id.* at 24.

The ALJ found that plaintiff's seizure disorder, and history of aneurysm with clipping was a severe impairment. *Id.* at 25. He also considered plaintiff's anxiety, but found it nonsevere because he did not take medications for it, no evidence suggested that it affected him, and no medical evidence suggested the presence of any of the "Paragraph B" criteria. *Id.* at 25, 26. He found plaintiff's tremors nonsevere because they were treatable with Xanax, they were transient, and the medical evidence did not document any limitations caused by them. *Id.* at 25.

And while plaintiff formerly suffered from alcoholism, the ALJ explained that he was in recovery, and it had never affected his ability to work. *Id.*

Next, the ALJ found that plaintiff's seizure disorder did not equal the severity of a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 27. At step three (3), the ALJ found that plaintiff retained the residual functional capacity (RFC) to perform light work because he could sit, walk, or stand for six (6) hours in an eight (8)-hour workday, and frequently lift or carry ten pounds (10 lbs), and frequently lift or carry twenty (20) pounds. *Id.* at 27. He was restricted from climbing scaffolding, ladders, and ropes, cannot work near moving mechanical parts, cannot be exposed to electrical shock, work near toxic or caustic chemicals, and cannot drive. *Id.* At step four (4), the ALJ determined that plaintiff cannot perform his past relevant work. *Id.* at 32. At step five (5), he determined that plaintiff's RFC and additional restrictions did not prevent him from working jobs existing in the national and local economies. *Id.* at 33.

## II.    DISCUSSION

### A.    Standards of Review

#### 1.    Rule 12(c)

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The standard applied to a Rule 12(c) motion is the same as that applied to a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010). To survive such a motion, "a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed.2d 868

11

(2009) (internal quotation marks omitted). The court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *Id.* at 679. The court is limited "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991).

   2.  Review of Determinations by the Commissioner of Social Security

  A court reviewing the final decision of the Commissioner may enter "judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A district court must consider whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Brault v. Social Sec. Admin., Com'r*, 683 F.3d 443, 447 (2d Cir. 2012) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). "[S]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation marks and citation omitted). "In determining whether the [Commissioner's] findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (internal quotation marks and citation omitted).

  Although the Commissioner's findings of fact are binding as long as they are supported by substantial evidence, this deferential standard of review does not apply to the Commissioner's conclusions of law or application of legal standards. *See Byam v. Barnhart*, 336 F.3d 172, 179

(2d Cir. 2003); *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984). Rather, courts have a statutory and constitutional duty to ensure that the Commissioner has applied the correct legal standards, regardless of whether the Commissioner's decision is supported by substantial evidence. *See Pollard v. Halter*, 377 F.3d 183, 188–89 (2d Cir. 2004). If a court finds that the Commissioner has failed to apply the correct legal standards, the court must determine if the "error of law *might* have affected the disposition of the case." *Id.* at 189 (emphasis added). If so, the Commissioner's decision must be reversed. *Id.*; *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). If the application of the correct legal standard could lead only to the same conclusion, the error is considered harmless and remand is unnecessary. *See Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

B.     Evaluation of Disability

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability benefits are only available where an individual has a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). For the purposes of this section:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in

13

the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

The regulations promulgated under the Social Security Act require the Commissioner to apply a five (5)-step sequential analysis to determine whether an individual is disabled under Title II of the Social Security Act. 20 C.F.R. § 404.1520; *see also Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). The first step of the sequential analysis requires the Commissioner to determine whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i) and (b). "Substantial work activity" "involves doing significant physical or mental activities." 20 C.F.R. § 416.972(a). "Gainful work activity" "is the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 416.972(b). If a claimant is doing "substantial gainful activity," the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(i) and (b). If the claimant is not engaged in any "substantial gainful activity," the Commissioner proceeds to the second step.

The second step requires the Commissioner to consider the medical severity of the claimant's impairment to determine whether he or she has a "severe medically determinable physical or mental impairment that meets the duration requirement in 20 C.F.R. § 404.1509, or a combination of impairments that is severe and meets the duration requirement." 20 C.F.R. § 404.1520(a)(4)(ii). An impairment, or combination of impairments, is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). To meet the duration requirement, the claimant's impairment must either be "expected to result in death, [or] it must have lasted or must be expected to last for a continuous

14

period of at least 12 months." 20 C.F.R. § 404.1509. The Commissioner will proceed to the next step only if the claimant's impairment is medically severe and meets the duration requirement.

At the third step, the Commissioner considers whether the claimant has a medically severe impairment that "meets or equals one of [the] listings in appendix 1 to subpart P of [20 C.F.R. Part 404 of the Social Security Act] and meets the duration requirement." 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairment meets or equals any of the listings and meets the duration requirement, the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(d). If the claimant is not found to be disabled at the third step, the Commissioner must "assess and make a finding about [the claimant's] residual functional capacity [("RFC")] based on all the relevant medical and other evidence." 20 C.F.R. § 404.1520(e). The RFC considers whether "[the claimant's] impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what [the claimant] can do in a work setting." 20 C.F.R. § 404.1545(a). The RFC is "the most [the claimant] can still do despite [his or her] limitations." *Id.*

At the fourth step, the Commissioner compares the RFC assessment "with the physical and mental demands of [the claimant's] past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(iv) and (f). If the claimant can still do his or her past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant cannot do his or her past relevant work, the Commissioner proceeds to the fifth and final step of the sequential analysis.

At the fifth step, the Commissioner considers the RFC assessment "and [the claimant's] age, education and work experience to see if [the claimant] can make an adjustment to other

work." 20 C.F.R. § 404.1520(a)(4)(v). If the claimant can adjust to other work, the claimant is not disabled. *Id.* If the claimant cannot adjust to other work, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(v). The claimant bears the burden of proving first four (4) steps of the sequential analysis, while the Commissioner bears the burden at the last step. *See Talavera*, 697 F.3d at 151.

C.       Application of the Five-Step Sequential Analysis

The Commissioner argues that the ALJ's decision rests on substantial evidence, and that the ALJ properly determined that, given plaintiff's RFC, he was not disabled under the applicable regulations. Defendant's Brief. (Def.'s Br.) 16–21. For the following reasons, the Court agrees, and affirms.

The Court finds substantial evidence in the record to support the ALJ's findings at steps one (1) through three (3). The ALJ properly found that the medical evidence does not show that plaintiff's hand tremors, anxiety, or substance abuse limit his ability to work. For example, Dr. Singh, who was aware of these conditions, did not place any restrictions on plaintiff, and did not recommend any follow-up treatment for them. Moreover, plaintiff's testimony, as well as the medical evidence, establish that he does not suffer at least one convulsive seizure per month as required by Listing 11.02, and that his last one occurred just over a year prior to the hearing. Tr. 55, 209, 211.

When a claimant's impairments fail to meet or equal any of the Listings, the Commissioner must assess the claimant's RFC before proceeding to the fourth step of

the sequential analysis. 20 C.F.R. §§ 404.1520(e); 404.1545(a)(5). The Commissioner's RFC assessment must be based on "all of the relevant medical and other evidence" in the case record, including "any statements about what [the claimant] can still do that have been provided by medical sources" and any "descriptions and observations of [the claimant's] limitations from [his or her] impairments, including limitations resulting from [his or her symptoms], such as pain, provided by [the claimant] or [other persons]." 20 C.F.R. § 404.1545(a)(3). In addition, the Commissioner must consider the claimant's "ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 404.1545(a)(4). Both a "limited ability to perform certain physical demands or work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching)" (20 C.F.R. § 404.1545(b)), and a "limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting" (20 C.F.R. §404.1545(c)), may reduce a claimant's ability to do past or other work. 20 C.F.R. § 404.1545(e) provides that:

> [w]hen [a claimant] ha[s] severe impairment(s), but [his or her] symptoms, signs, and laboratory findings do not meet or equal those of a listed impairment in [the Listings], [the Commissioner] will consider the limiting effects of all [the claimant's] impairment(s), even those that are not severe, in determining [his or her] residual functional capacity. Pain or other symptoms may cause a limitation of function beyond that which can be determined on the basis of the anatomical, physiological or psychological abnormalities considered alone...In assessing the total limiting effects of [a claimant's] impairment(s) and any related symptoms, [the Commissioner] will consider all of the medical and nonmedical evidence...

20 C.F.R. § 404.1545(e).

In "determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account . . . but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citations omitted). The ALJ retains discretion to assess the credibility of a claimant's testimony regarding disabling pain and "to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979); *Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999) (holding that an ALJ is in a better position to decide credibility). "Because it is the function of the agency, not reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant, we will defer to its determinations as long as they are supported by substantial evidence." *Reynolds v. Colvin*, 570 F. App'x 45, 49 (2d Cir. 2014) (summary order) (internal citations omitted). The Second Circuit has "repeatedly held that a claimant's testimony concerning his pain and suffering is not only probative on the issue of disability, but 'may serve as the basis for establishing disability, even when such pain is unaccompanied by positive clinical findings or other 'objective' medical evidence.'" *Hankerson v. Harris*, 636 F.2d 893, 895 (2d Cir. 1980) (quoting *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979)). Thus, where there is a "medically determinable impairment[] that could reasonably be expected to produce [the claimant's] symptoms, such as pain," the ALJ "must then evaluate the intensity and persistence" of the symptoms to determine how the symptoms limit a claimant's capacity for work. 20 C.F.R. § 404.1529(c)(1). "Further, because a claimant's symptoms, such as pain, 'sometimes suggest a greater severity of impairment than can be shown by objective

medical evidence alone,' once a claimant has been found to have a pain-producing impairment, the Commissioner may not reject the claimant's statements about his pain solely because objective medical evidence does not substantiate those statements." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 349–50 (E.D.N.Y. 2010) (citing 20 C.F.R. § 404.1529(c)(2)-(3)).

In assessing a claimant's allegations concerning the severity of his symptoms, an ALJ must engage in a two-step analysis. First, "the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1529(b)). Second, [i]f the claimant does suffer from such an impairment . . . the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record." *Id.*

If plaintiff's testimony concerning the intensity, persistence or functional limitations associated with his impairments is not fully supported by clinical evidence, the ALJ must consider additional factors in order to assess that testimony, including: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the pain; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain. 20 C.F.R. § 404.1529(c)(3)(i)-(vii); *Meadors v. Astrue*, 370 Fed. Appx. 179, 183 n.1 (2d Cir. 2010) (citing 20 C.F.R. 404.1529(c)(3)). An ALJ who finds that a claimant is not credible must do so

"explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his determination is supported by substantial evidence." *Rivera v. Astrue*, No. 10-civ-4324, 2012 WL 3614323, at *14 (E.D.N.Y. Aug. 21, 2012) (quoting *Taub v. Astrue*, No. 10-civ-2526, 2011 WL 6951228, at *8 (E.D.N.Y. Dec. 30, 2011).

The ALJ properly followed this two-step process, and found that based upon substantial evidence, that plaintiff has the RFC to perform light work, in spite of his subjective complaints. While the medical evidence established that plaintiff's epilepsy caused his seizures, the ALJ found plaintiff's assertion that he is unable to work not credible. *Id.* at 31. Plaintiff's testimony establishes that he faces no limitations in his daily activities, maintains an active social life, and is able to use public transportation. *See* 20 C.F.R. § 404.1529(c)(3)(i) (providing that ALJ may consider claimant's daily activities to assess credibility of subjective complaints). Moreover, he is able to control his seizure condition with Keppra, and has not experienced any seizures since he increased his dosage. 20 C.F.R. § 404.1529(c)(3)(iv); Tr. 243. The medical records from Danbury Hospital and Dr. Steiner also suggest that plaintiff is able to control his seizure condition by abstaining from drugs and alcohol. 20 C.F.R. § 404.1529(c)(3)(iv); Tr. 238, 241, 279–84. In sum, the ALJ did not unreasonably reject plaintiff's subjective complaints when determining his RFC, but properly assessed these complaints in light of the factors set forth in 20 C.F.R. § 404.1529(c).

Otherwise, the ALJ properly credited the RFC assessment of Dr. Singh, plaintiff's treating physician and a board-certified neurologist, and resolved its ambiguity as to whether

plaintiff could work. An ALJ may accord a treating physician's medical opinion controlling weight in determining a claimant's disability. *See* 20 C.F.R. § 404.1527(c)(2). However, its is well-settled that the ultimate determination of whether a claimant is disabled is reserved for the ALJ. *E.g., Snell*, 177 F.3d at 133; 20 C.F.R. § 404.1527 § 404.1527(d). Dr. Singh opined that plaintiff's seizure condition rendered him "totally disabled," and unable to work, but also placed restrictions on his "working conditions," and listed limitations that suggest that plaintiff retains the RFC for light duty work. *See* 20 C.F.R. § 404.1567(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."); Tr. 647. The ALJ was free to accept Dr. Singh's assessment of plaintiff's RFC, as well as his restrictions, and reject his conclusion that plaintiff was disabled.

Finally, the ALJ did not err by relying on the testimony of the vocational expert to determine that plaintiff, although unable perform past relevant work, nevertheless retained the RFC to perform several jobs, DOT 706.684-022, DOT 739.687-182, or DOT 211.462.010, which existed in significant numbers in the local and national economies. *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) (explaining that ALJ may rely on "vocational expert's testimony regarding a hypothetical" so long as hypothetical accurately reflects claimant's limitations and is based on substantial evidence) (citing *Dumas v. Schweiker*, 712 F.2d 1545, 1553–54 (2d Cir.1983); *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir.1981)); *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999) (explaining that ALJ may satisfy burden at step five (5) by relying on testimony of vocational expert). The ALJ's hypothetical question to Ms. Vrook, the vocational expert, closely tracked the RFC assessment provided by Dr. Singh. Tr. 61–63, 647.

21

Consequently, the ALJ satisfied his burden at step five (5), and properly found that plaintiff is not disabled.

III.    CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure is granted.

**SO ORDERED**.

s/ Sandra J. Feuerstein
Sandra J. Feuerstein
United States District Judge

Dated: September 30, 2015
       Central Islip, New York